J-S37034-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.A.C., a Minor | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.C., Mother | : | No. 223 MDA 2017 |

Appeal from the Decree entered January 31, 2017
in the Court of Common Pleas of Lancaster County,
Orphans' Court Division, No(s): 1805 of 2015

| | | |
|---|---|---|
| IN THE INTEREST OF: M.L.C., a Minor | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.C., Mother | : | No. 224 MDA 2017 |

Appeal from the Decree entered January 31, 2017
in the Court of Common Pleas of Lancaster County,
Orphans' Court Division, No(s): 1804 of 2015

| | | |
|---|---|---|
| IN THE INTEREST OF: M.X.C., a Minor | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.C., Mother | : | No. 225 MDA 2017 |

Appeal from the Decree entered January 31, 2017
in the Court of Common Pleas of Lancaster County,
Orphans' Court Division, No(s): 1803 of 2015

J-S37034-17

IN THE INTEREST OF: D.M.C.S., a     :     IN THE SUPERIOR COURT OF
Minor                        :            PENNSYLVANIA
                                    :
                                    :
                                    :
                                    :
                                    :
APPEAL OF: H.C., Mother        :        No. 226 MDA 2017

Appeal from the Decree entered January 31, 2017
in the Court of Common Pleas of Lancaster County,
Orphans' Court Division, No(s): 1802 of 2015

BEFORE: STABILE, MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:           **FILED JUNE 27, 2017**

H.C. ("Mother") appeals from the Decree granting the Petition filed by the Lancaster County Children and Youth Social Service Agency ("the Agency") for the involuntary termination of her parental rights to M.A.C. (born in 2010), M.L.C. (born in 2009), M.X.C. (born in 2008) and D.M.C.S. (born in 2006) (collectively "Children") under the Adoption Act. **See** 23 Pa.C.S.A. § 2511.[1] We affirm.

In its Opinion, the trial court set forth the relevant factual and procedural history, which we adopt for the purpose of this appeal. **See** Trial Court Opinion, 2/22/17, at 1-7.

On appeal, Mother raises the following issues for our review:

---

[1] In its Decree, the trial court also changed Children's permanency goals to adoption. However, Mother challenges only the termination of her parental rights to Children, and does not challenge the changing of Children's permanency goals to adoption.

- 2 -

  A. Whether the evidence presented at the [t]ermination of [p]arental rights hearing was sufficient to support [the] termination of Mother's [parental] rights[?]

  B. Whether the evidence presented at the [t]ermination of [p]arental rights hearing was sufficient to find that it was in the best interests of [C]hildren to terminate Mother's parental rights[?]

Brief for Mother at 7.[2]

Our standard of review is as follows:

  [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

  … [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must

---

[2] Although Mother has identified two issues in her Statement of Questions Presented, she failed to separate her issues in the Argument section of her brief, or provide headings for the issues. *See* Pa.R.A.P. 2119(a) (providing that "[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein….").

defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (citations omitted).

Termination of parental rights is controlled by section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The burden is on the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id*. (citation and quotation marks omitted).

Satisfaction of any one subsection of section 2511(a), along with consideration of subsection 2511(b), is sufficient for the involuntary termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we will review the trial court's decision to terminate Mother's parental rights based upon subsections 2511(a)(8) and (b), which state the following:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with

- 4 -

an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

With respect to subsection 2511(a)(8), Mother contends that the conditions which led to placement of Children were "truancy [], chaos in the home, concerns for drug use[,] and domestic violence in the home." Brief for Mother at 24. Mother asserts that "[t]he evidence offered in the [termination] hearings suggests that those issues have been addressed." *Id*.

"Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the children's removal continue to exist, despite the reasonable

good faith efforts of the Agency supplied over a realistic time period. *Id*. The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child[ren] is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Further,

> the application of [subs]ection (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

*Id*. at 11-12 (citation omitted, emphasis in original).

In its Opinion, the trial court considered the requirements of subsection 2511(a)(8), and determined that the Agency had met its burden of proving the grounds for termination of Mother's parental rights to Children. *See* Trial Court Opinion, 2/22/17, at 10-11 (wherein the court determined that Mother's efforts have been minimal, she has never secured stable income or suitable housing, and Children have been in placement for 33 months). We agree with the trial court's determination, which is supported by the record and free of legal error, and affirm on this basis as to Mother's first issue. *See id*.

- 6 -

With respect to subsection 2511(b), Mother contends that Suzanne Ail, Ph.D ("Dr. Ail"), the psychologist who performed the bonding assessment, utilized improper or incorrect information to make her recommendation that, despite the existence of bonds between Mother and Children, Mother's parental rights should be terminated. Brief for Mother at 24. Mother asserts that, while it is commonplace in custody proceedings to evaluate a child's bonds with the biological parents as well as the foster parents, this practice is "inappropriate and out of place in an attachment evaluation." *Id*. at 24-25. Mother claims that, whereas a biological parent's relationship with a child will be strained by separation when placement occurs, "the foster family's interactions with the child[] will almost always appear to be stronger … than those of a biological parent's." *Id*. Mother argues that Dr. Ail's assessment failed "to account for the tremendous disparity in time that [M]other had with [C]hildren compared with that of the foster families." *Id*. Mother also points to Dr. Ail's observations of Mother playing with Children, and contends that Dr. Ail's conclusions drawn from such observations do "not allow for such realities as a child who is willful, and does not wish to follow the prompts of an adult." *Id*. Mother asserts that, in making her recommendation, Dr. Ail improperly considered the level of progress that Mother had made in her plan which, Mother claims, is irrelevant to an attachment analysis. *Id*. at 26. Mother further argues that, in making her assessment, Dr. Ail improperly conducted a "best interests" analysis which,

Mother contends, is the exclusive province of the trial court. *Id*. Mother asserts that Dr. Ail's judgment was clouded by her belief that, despite the termination of Mother's parental rights, Mother would always be permitted to be a part of Children's lives. *Id*. Mother claims that the trial court failed to recognize Dr. Ail's bias, and the flaws in her assessment. *Id*.

Mother also contends that her inability to obtain appropriate housing and income, in order to support herself and Children, is beyond her control. *Id*. at 21, 22. Mother asserts that her panic attacks prevent her from maintaining employment. *Id*. at 21; *see also id*. at 22 (wherein Mother claims that mental health diagnoses are "beyond the control" of a parent). Mother argues that her lack of adequate housing was also caused by the removal of Children from her home. *Id*. at 22. Mother contends that, "[o]nce the [A]gency removed [C]hildren from [her] home[,] the [supplemental security income] payments [that she had been receiving for Children] were then paid to the [A]gency or county, not [M]other." *Id*.

Regarding subsection 2511(b), the court inquires whether the termination of Mother's parental rights would best serve the developmental, physical and emotional needs and welfare of the child. *See In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id*. at 1287 (citation omitted). The court must also discern the nature and status of the parent-child bond, with utmost attention

to the effect on the child of permanently severing that bond. *Id*.; *see also In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (stating that "the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship."). Additionally, "the strength of emotional bond between a child and a potential adoptive parent is an important consideration in a 'best interests' analysis." *In re I.J.*, 972 A.2d at 13; *see also In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (stating that "courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."). Finally, the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child under section 2511(b). *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

In its Opinion, the trial court considered the requirements of subsection 2511(b), and determined that the Agency had met its burden of proving that it was in Children's best interests to terminate Mother's parental rights. *See* Trial Court Opinion, 2/22/17, at 12 (wherein the court determined that, while each of the Children have an attachment to Mother, the court "does not see a bond between Mother and [C]hildren sufficient to interfere with the termination of Mother's parental rights[;]" and their bonds with their respective placement parents are considerably stronger and warmer than their attachments to Mother); *see also id*. (wherein the court

noted that D.M.C.S. and M.X.C. have "fractured" relationships with Mother). We agree with the trial court's determination, which is supported by the record and free of legal error, and affirm on this basis as to Mother's second issue.  ***See id***.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2017

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY PENNSYLVANIA
ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN RE: D.M.C.S. | : | Docket No: 1802 OF 2015 |
| | : | SUPERIOR CT NO: 226 MDA 2017 |
| IN RE: M.X.C. | : | Docket No: 1803 OF 2015 |
| | : | SUPERIOR CT NO: 225 MDA 2017 |
| IN RE: M.L.C. | : | Docket No: 1804 OF 2015 |
| | : | SUPERIOR CT NO: 224 MDA 2017 |
| IN RE: M.A.C. | : | Docket No: 1805 OF 2015 |
| | : | SUPERIOR CT NO: 223 MDA 2017 |

BY GORBEY, J.

## OPINION SUR APPEAL

### Procedural History

This matter came before this Court on the Petition filed on August 13, 2015 by the Lancaster County Children and Youth Social Service Agency ("Agency") to terminate the parental rights of the birth parents of D.M.C.S. ("D"), born ~~██████~~, ~~██~~ M.X.C. ("M.X"), born ~~██████~~, ~~███~~, M.L.C. ("M.L."), born ~~████████████~~, and M.A.C. ("M.A."), born ~~██████~~, ~~███~~. Mother H.C. ("Mother") and P.M.T.[1] are the parents of D. Mother and M.C.-L. ("Father") are the parents of M.X., M.L., and M.A.[2]

---

[1] P.M.T. died on February 21, 2013, and as such, his rights are not at issue in the matter at hand.

[2] Father's rights to M.X., M.L., and M.A. were terminated on November 23, 2015, and as such, his rights are not at issue in the matter at hand.

This family's contact with the Court in the dependency matter began with the Agency's filing for legal custody of all four children, granted by the Court on October 28, 2013.[3] Subsequently, the Agency filed a Petition for physical custody of all four children, granted by the Court on May 5, 2014. The Agency then filed an August 13, 2015 Petition to terminate the parental rights of Mother and Father. Several hearings were continued and rescheduled, and a final hearing was held on January 30, 2017; Mother was present with counsel. That day, a Decree was issued to terminate the parental rights of Mother to D., M.X., M.L., and M.A. On February 2, 2017, Mother appealed the January 30, 2017 decree to the Pennsylvania Superior Court.

## Factual History

Mother has six children, including the four at issue herein, plus J.S., born ⬛⬛⬛⬛⬛⬛, and A.S., born ⬛⬛⬛⬛⬛.[4] DP-docket October 1, 2013 Petition. The Agency became involved in 2005, with reports of drug use, domestic violence, mental health issues and truancy. Reports of truancy and concerns with drug use surfaced again in 2012, and resulted in a January 9, 2013 Family Service Plan ("FSP") to address these concerns.

The following month, M.C.-L. broke into Mother's home and then shot and killed her paramour P.M.T. (the father of D). DP-docket October 1, 2013 Petition. Two of

---

[3]These cases are docketed to CP-36-DP-142-2013 (D), CP-36-DP-139-2013 (M.X), CP-36-DP-141-2013 (M.L.), and CP-36-DP-140-2013 (M.A.). These cases were incorporated into the instant Orphans' Court matter by Order dated November 23, 2015. For clarity's sake, we refer to either the OC-docket or the DP-docket, and the date and title of the document cited.

[4]These two older children have also been the subject of dependency actions, with CASA volunteers assigned, but these children do not wish to be adopted and so are not included in the action at hand. N.T. March 14, 2016 at 8-9.

2

Mother's children, J.S. and D., were present in the home at the time of the killing and entered the room after P.M.T. was killed. The Agency noted that there were drugs in the home on the night that P.M.T. was killed, and that there was a history of domestic violence between Mother and Father. Father has been incarcerated since this date, pending trial for murder charges. *See* Criminal Docket history for Father, submitted as *OC-docket*, November 23, 2015 Agency Ex. 1.

After that event, emotional support services were offered to J.S. and D, including in-school treatment, but that help was only intermittently-accepted. *DP-docket* October 1, 2013 Petition. Further, Mother was not compliant with Agency efforts to drug-screen her. Truancy continued to be an issue for J.S., A.S., D, and M.X., which interfered with in-school emotional support services. Mother began but failed to complete mental health counseling. The Agency also had reports of men living in Mother's home, but Mother failed to provide the Agency with information about these men. Pursuant to the Agency's Petition, the Court found the four children to be Dependent on October 29, 2013. *DP-docket*.

By May 5, 2014, Mother made only minimal progress towards alleviating the circumstances that created the need for placement of the children, and the Court ordered that physical custody of the children be transferred to the Agency and the Placement Goal being changed to "return to parent" with a concurrent goal of "adoption." Specifically, the children's attendance at school had not improved, Mother. had not attended mental health treatment, and was avoiding the Agency caseworker's unannounced visits. That hearing concluded with intervention by the Sheriff's deputies to assist with Mother, who was out of control. *DP-docket* May 5, 2014 Order.

3

On May 9, 2014, the placement for D and M.X. was modified and they were moved to a kinship resource home with their maternal grandfather, grandmother, and older half-sister J.S. No single resource home was available to accommodate all of Mother's children who needed placement, so M.L. and M.A. were placed together in a resource home.

In July of 2014, a Child Permanency Plan was drafted by the Agency which contained a number of goals for Mother. These goals included mental health evaluations and treatment as recommended, drug and alcohol evaluations and treatment as recommended, parenting classes when appropriate, financial and housing stability, commitment to the children, and avoiding domestic violence. At that time, the Agency noted that Mother had signed releases for treatment and had undergone some evaluations, but had not begun any treatment and had tested positive for cocaine use. *DP-docket* August 11, 2014 Order. The Court's Order called this "minimal progress" and noted that Mother had no housing and only recently began employment.

A permanency review hearing in December of 2014 indicated that drug use, truancy, and untreated mental health issues persisted. *DP-docket* August 11, 2014 Order. Mother's psychological evaluation indicated a number of diagnoses, including post-traumatic stress disorder, panic disorder, major depressive disorder, poly-substance dependence, intermittent explosive disorder, antisocial behavior, and personality disorder. Mother tested positive again for cocaine in an October 2014 drug screen. Mother was not employed and had not applied for any benefits. Mother's housing status was unclear. The Court's Order again called this "minimal progress."

4

In March of 2015, a status review hearing was held. The Court noted that Mother had "not done much on her plan" and that "the children will be remaining with their grandparents for some time." *DP-docket* March 26, 2015 Order.

An April 2015 permanency review Petition indicated that Mother had started outpatient counseling to address anger and domestic violence issues, and had undergone a psychiatric evaluation and had checked herself into Lancaster General Hospital in March for three days. Mother was living with friends and had no income. The Court's May 21, 2015 Order noted that Mother has made only "minimal progress" on her plan and not accomplished any goals. Mother had been discharged from mental health treatment for failing to attend, had unsuitable housing with her paramour who has an "extensive criminal record," had not started parenting classes because she has not completed her mental health treatment, and had tested positive for alcohol usage prior to one of her visits with the children. *DP-docket* May 22, 2015 Order. On August 18, 2015, the Agency filed a Petition to Terminate Mother's parental rights.

In a September 2015 permanency review Petition, the Agency indicated that Mother had again missed therapy appointments and had begun treatment with a new provider, was living with friends and had no employment. Concerns were also reported of domestic violence in her current romantic relationship and Mother was referred for services. *DP-docket* September 14, 2015 Petition.

On March 14, 2016, the Court began a hearing on termination of Mother's parental rights[5]. The Agency recommended that the placement goals for the children

---

[5] This hearing was continued pending the results from an in-progress bonding assessment on all four children. (N.T. March 14, 2016 at 19-20, 26, 27, N.T. Jan. 30, 2017 at 4).

5

be changed from "return to home" to "adoption" and that visits between Mother and the children be suspended. (N.T. at 9, 10-11, 13-14). The Agency noted that Mother has since moved in with the paramour, despite warnings that it is inappropriate for the children to be in his presence. (N.T. March 14, 2016 at 7). Mother had applied for benefits, but was denied Social Security and had recently begun and then ended employment. (N.T. March 14, 2016 at 7-8). The Court noted that, while Mother visits the children, she "has not accomplished any goal on her plan." *DP-docket* March 14, 2016 Order.

On January 30, 2017, the Court held the remainder of the hearing on the Agency's Petition to Terminate the parental rights of Mother. (N.T. Jan. 30, 2017 at 4). Mother was present and represented by counsel. Dr. Suzanne Ail, PH.D., was offered as an expert in Mother-Child Bonding, and testified about the bonding assessment she conducted with the families. (N.T. Jan. 30, 2017 at 5-8). Regarding D, Dr. Ail's Report noted that D wants Mother to get her act together and to "get out of the house with that man," that D was guarded with her Mother but is open, affectionate and trusting with her grandparents. (Report p. 2, N.T. Jan. 30, 2017 at 19-20, 24). Dr. Ail paid attention to D's history of trauma, having witnessed her father's death, and the reverberations this trauma has had in D's life, including being out of control, police and 911-involvement, and in-patient hospital stays, and noted that D's grandparents "admirably tenacity and persistence in the face of [D's] severe emotional distress and dangerous outbursts. *OC-docket* December 8, 2016 Report p. 14, N.T. Jan. 30, 2017 at 24. Regarding M.X., Dr. Ail noted that while M.X. loves his Mother, he is likewise unresponsive to her affections, and he worries that Father will be released from jail, reflective of the trauma

6

he has experienced. (N.T. Jan. 30, 2017 at 20-21). In contrast, M.X. has a "sturdy attachment" to his grandparents, particularly his grandfather. *OC-docket* November 27, 2016 Report p. 15, N.T. Jan. 30, 2017 at 17, 21, 24-25.

Regarding M.L., Dr. Ail noted that M.L. "clearly has an attachment to her mother" but also has an attachment to her placement parents, showing similar attachments to both. *OC-docket* September 26, 2016 Report p. 13-14, N.T. Jan. 30, 2017 at 21-22, 23-24. Finally, regarding M.A., Dr. Ail noted that M.A. also has an attachment to her mother, but also to her placement parents, and referred to them as Mommy and Daddy. *OC-docket* October 12, 2016 Report p.12-13, N.T. Jan. 30, 2017 at 22, 24. Dr. Ail also noted the considerable efforts of both grandparents and the placement parents of M.L. and M.A. to keep these four children in contact with their each other, with the placement parents referring to each other in friendly terms. (N.T. Jan. 30, 2017 at 28).

At the conclusion of the hearing, the Court issued an Order terminating Mother's parental rights to the four children at issue. The Court found clear and convincing evidence of Mother's failure to perform parental duties for more than twelve months, that Mother's continued incapacity caused the children to be without essential parental care, that Mother cannot remedy the causes within a reasonable period of time, and that termination of Mother's rights would best serve the children.

The Court notes that Court-Appointed Special Advocates ("CASA") have been involved in with the family since 2014, that the CASAs have filed numerous reports for each of the four children at issue over the years of involvement, and that the CASAs are in agreement with the Agency, that termination of Mother's parental rights will serve the best interests of the children.

7

## ISSUE

Whether a termination of parental rights is appropriate when the children have been in placement for almost three years during which time Mother has not completed any part of her child permanency plan, and where expert testimony indicates that the best interests of the children will be served by terminating Mother's rights?

## ANALYSIS

Parental rights may be terminated by statute; the pertinent statute, 23 Pa. C.S. §2511(a), provides for termination of those rights when:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ...
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> ...
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

8

"In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re Adoption of M.R.B.*, 25 A.3d 1247, 1251 (Pa. Super. 2011). "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *M.R.B.*, supra, at 1251.

When the Agency has met its burden under Section 2511(a), the Court must also look to the requirements of Section 2511(b) before terminating any parental rights. "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. §2511(b). Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent. *In re A.R.*, 837 A.2d 560 (Pa. Super. 2003). "Considering what situation would best serve the child's needs and welfare, the court must examine the status of the bond between the natural parent and the child to consider whether terminating the parent's rights would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa. Super. 2003).

On appeal, Mother asserts that the Court's Order is not supported by evidence, and not in the best interests of the children. A review of the record, however, indicates otherwise.

## TIMING

The language of 23 Pa.C.S. §2511(a), sections 1, 5 and 8 requires the Court to examine the facts in the context of time, specifically: the six-month period before the filing of the Petition to Terminate Parental Rights (a)(1); the child's legal status over six months (a)(5); and the child's status over 12-months after placement (a)(8). At the time of this writing, the children have been in placement for 33 months, including 22 months between the October 29, 2013 dependency determination and the August 18, 2015 Petition to Terminate Parental Rights and in the twelve-months after that dependency determination. This Court is concerned that forcing the children to remain in the uncertainty of placement, after almost three years already in placement, while continuing to wait for Mother to change, will be harmful to them. The requirements of 23 Pa.C.S. §2511(a), sections 1, 5 and 8, have been met.

## PARENTAL EFFORTS

The language of 23 Pa.C.S. §2511(a), sections 1, 2, 5 and 8 requires the Court to examine Mother's conduct, specifically; Mother's refusal or failure to perform parental duties (a)(1); Mother's incapacity, abuse, neglect or refusal to care for her children and whether the underlying causes can or will be remedied (a)(2); the causes of the children's placement and whether Mother can remedy the causes with the assistance of services (a)(5); and the causes of placement and whether the causes continue (a)(8). "The focus of the termination proceeding is on the conduct of the parent and whether

10

his conduct justifies termination of parental rights." *In re B.,N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004).

As this Court has said before, Mother's efforts have been minimal. In nearly three years, Mother has not been successfully discharged from mental health or drug and alcohol treatment, she has not begun OR completed parenting training, and she has never secured stable income or suitable housing. Arguably, the only goal that Mother has continued with is regularly asking caseworkers about her children.

Parental duty is "best understood in relation to needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in development of the child. ... [T]he parental obligation is a positive duty which requires affirmative performance.". *In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000). *In re G.P-R*, 851 A.2d 967 (Pa. Super. 2004). . "Where the child is in foster care, this affirmative duty requires the parent to work towards the return of the child by cooperating with the Agency to obtain the rehabilitative services necessary for him to be capable of performing his parental duties and responsibilities." *In re G.P.R.*, 851 A.2d 967, 977 (Pa. Super. 2004), *summarizing In re: William L.*, 383 A.2d 1228, 1233-34 (Pa. 1978).

Here, Mother's continued inability to care for her children or to complete permanency plans for reunification supports the termination decision in the Orphans' Court. This Court cannot gamble with the safety and welfare of these children. Mother has had ample opportunities to demonstrate her ability to be an acceptable parent but has failed to do so. The requirements of 23 Pa.C.S. §2511(a), sections 1, 2, 5 and 8, have been met.

11

## BEST INTERESTS OF THE CHILDREN

The language of 23 Pa.C.S. §2511(a), sections 5 and 8 requires the Court to examine whether termination of Mother's rights would best serve the needs and welfare of the child.

The Court does not see a bond between Mother and these children sufficient to interfere with the termination of Mother's parental rights. Dr. Ail, a psychologist who performed the bonding assessment, disclosed that each child recognized and interacted with Mother and, to varying degrees, had an attachment to Mother, but that their interactions with their respective placement parents were considerably stronger and warmer. The Court notes that Dr. Ail is also in agreement that Mother's parental rights be terminated, noting that the children's bonds with their placement families were successful, especially so in the case of D and M.X., who have a 'fractured' relationship with Mother. (N.T. Jan. 30, 2017 at 25-28, 29).

These children deserve the certainty of remaining with parents they love and are bonded to, and do not deserve the Mother who is unwilling to care for them in a healthy and appropriate manner; the requirements of 23 Pa.C.S. §2511(a), sections 5 and 8, have been met.

By clear and convincing evidence, the Agency has met its burden to terminate Mother's parental rights under Sections 2511(a)(1), (a)(2), (a)(5) and (a)(8).

## CONCLUSION

For the reasons stated above, the Court concludes that it is appropriate to terminate Mother's parental rights to D, M.X., M.L. and M.A. The Clerk of the Orphans'

Court is directed to transmit the record, *with incorporated dockets,* to the Superior Court.

BY THE COURT:

DATED: February 22, 2017

LESLIE GORBEY, JUDGE

Attest:

Copies to:
    John P. Stengel, Esquire
    Gina Carnes, Esquire
    Laura McGarry, Esquire

13